**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jay Kennedy Johari, et al., | No. CV-17-00095-PHX-ROS |
| Plaintiffs, | **ORDER** |
| v. | |
| City of Tempe, et al., | |
| Defendants. | |

Plaintiff Jay Johari, a managing member and operator of a bar in Tempe, Arizona, was arrested in connection with two incidents: the first involving allegations of sexual abuse and the second involving a bar fight. Following Johari's arrests, Plaintiffs brought claims against Defendants—the City of Tempe and various officers of the Tempe Police Department—for malicious prosecution, selective prosecution, abuse of process, violation of the right to pursue an occupation, conspiracy, *Monell* liability, negligence and gross negligence, and tortious interference with business relations. The parties cross-moved for summary judgment. (Docs. 77, 87.) For the following reasons, summary judgment is granted to Defendants.[1]

## BACKGROUND

Plaintiffs Jay Johari ("Johari") and Christina P. Lamb ("Lamb") are husband and wife.[2] (Doc. 6 at 2.) Plaintiff R.J.E., LLC is an Arizona limited liability company doing

---

[1] Plaintiffs' request for oral argument is denied because the issues have been fully briefed and oral argument will not aid the Court's decision.
[2] Unless otherwise noted, factual statements included in the Court's summary are undisputed.

business as Vintage Bar and Grill and, later, renamed as BAC Lounge (collectively, the "Bar"). (Doc. 6 at 2.) Johari is a managing member and operator of the Bar. (Doc. 6 at 2.) While operating the Bar, Johari has had multiple encounters with the Tempe Police Department, and has been arrested on two separate occasions: the LG matter and the Sims matter.

## I.     The LG Matter

On October 16, 2012, at 3:29 A.M., Officer Daniel Reynolds was dispatched to the Silver Mine Subs restaurant in Tempe, Arizona, in response to a 911 call reporting that a woman was held captive in a local bar. (Doc. 70-1 at 3.) Officer Reynolds located Samuel Fleager ("Fleager") and Larissa Gossmann ("LG"), the complainants, outside of Silver Mine Subs, and separately interviewed the two. (Doc. 70-2 at 3.)

Fleager told Officer Reynolds that one of his employees at Silver Mine Subs informed him that LG had come to the restaurant requesting help because she had been "held captive in the bar above." (Doc. 70-2 at 49.) Fleager called 911 and observed a male approach LG and talk to her. (Doc. 70-2 at 49.) Fleager told police that he assumed the male was the person that had held her captive. (Doc. 70-2 at 49.)

Officer Reynolds also interviewed LG, who was "clearly intoxicated" and vomited on the sidewalk. (Doc. 70-2 at 49.) She submitted to a Preliminary Breath Test ("PBT") and registered a BrAC of 0.183. (Doc. 70-2 at 50.) LG told the police the following account, which was recorded in the police report: LG responded to a Craigslist advertisement for employment at a "new bar" in Tempe. (Doc. 70-2 at 50.) LG then received an email from someone named Jay,[3] who identified himself as the manager of Vintage Bar, and requested her age and a photo. (Doc. 70-2 at 50.) LG told Jay Johari she was twenty years old and submitted a photo, and Johari asked LG to come to the Bar and interview for a "promo girl" position on October 15, 2012. (Doc. 70-2 at 50; Ex. 3.) At approximately 10 P.M. on October 15, 2012, LG arrived at the Bar for her interview. (Doc. 70-2 at 50.) Johari brought LG to his office and interviewed her for approximately 45

---

[3] It is undisputed that "Jay" is Plaintiff Jay Johari. Although the police reports use "Jay" to refer to Jay Johari, the Court uses "Johari" for consistency.

minutes. (Doc. 70-2 at 50.) During the interview, Johari made a copy of LG's Arizona ID card showing that she was twenty years old. (Doc. 70-2 at 50.) Johari instructed LG to change into the swimsuit that she was asked to bring, and left the office while she did so. (Doc. 70-2 at 51.) After she changed, Johari returned with a female employee and the three individuals stayed in the office for approximately ten more minutes. (Doc. 70-2 at 51.) Johari asked LG to change into another outfit, a strapless cocktail dress, and to "mingle" with the guests at the Bar. (Doc. 70-2 at 51.)

Johari and LG then went to the bar area and talked to some guests. (Doc. 70-2 at 52.) Johari poured LG a "Mexican Birthday" shot of hard alcohol and she drank it. (Doc. 70-2 at 52.) Johari told LG that she was hired as a promo girl and asked her to stay at the Bar. (Doc. 70-2 at 52.) LG stayed because "she did not feel the interview was over" and felt that "if she left she may not get the job." (Doc. 70-2 at 52.) Johari continued to pour shots for LG and she drank approximately four to five shots of hard alcohol. (Doc. 70-2 at 52.) At some point in the night, Johari, LG, and the female employee went back to the office. (Doc. 70-2 at 52.) LG was not feeling well due to drinking too much alcohol and laid down on the black leather couch in the office and fell asleep. (Doc. 70-2 at 52.) At an unknown time, LG woke up to someone "rubbing her on her exposed side from her shoulder to her thigh," as well as kissing her neck. (Doc. 70-2 at 53.) LG saw that it was Johari, who was kneeling on the couch on his knees in front of her and pulling on her waist. (Doc. 70-2 at 53.) LG told Johari to "stop" and pushed his hand away. (Doc. 70-2 at 53.) Johari then lifted LG's dress at the bottom and slid his hand under the dress to "grip[] her butt cheek." (Doc. 70-2 at 53.) Next, Johari "place[d] his hand in between [LG's] butt cheeks rubbing against her anus. . . . [Johari] touched [LG's] anus over her thong underwear. [Johari] then slid his hand from [LG's] anus to her vagina. [Johari] rubbed his hand against [LG's] vagina over her thong underwear." (Doc. 70-2 at 53.)

LG again told Johari to stop and moved his hand away. (Doc. 70-2 at 53.) She got up from the couch and exited the office to the bar area, which was deserted. (Doc. 70-2 at 53.) Johari followed LG out of the office. (Doc. 70-2 at 53.) LG tried to exit the bar but

found that several of the doors were locked and Johari refused to unlock them. (Doc. 70-2 at 53.) Meanwhile, Johari tried to get LG to calm down and told her that she was "crazy" and "drunk." (Doc. 70-2 at 53.) After trying three to four doors, LG finally found an unlocked door and ran out. (Doc. 70-2 at 53.) She saw that an employee was still working at Silver Mine Subs and asked him to call 911. (Doc. 70-2 at 53.) Johari then arrived at Silver Mine Subs and tried to talk to LG. (Doc. 70-2 at 53.) At the request of a Silver Mine Subs employee, LG went inside to wait for the police. (Doc. 70-2 at 53.)

In a photo lineup, LG positively identified Johari as the suspect that gave her alcohol and touched her anus and vagina. (Doc. 70-2 at 54.) The police secured the front and rear entrances of the Bar. (Doc. 70-2 at 54.) Detective Bradley Breckow was assigned to the investigation. (Doc. 70-2 at 6.) On the morning of October 16, Detective Breckow arranged for LG to undergo a SANE[4] exam at the Scottsdale Family Advocacy Center. (Doc. 70-2 at 8.) At around 8:50 A.M., Johari exited the secured rear door of the Bar and asked police why they were there. (Doc. 70-2 at 8.) Detective Breckow then interviewed Johari. According to the interview summary, Johari stated "he had just arrived at the bar and wanted to know what was going on." (Doc. 70-2 at 8.) Detective Breckow questioned how Johari arrived without being noticed by police, since both the front and rear doors of the Bar were secured. (Doc. 70-2 at 8.) Johari stated he arrived at the Bar after the property manager told him police officers were there, and he came in through the front entrance and did not see any police. (Doc. 70-2 at 8.)

Johari told Detective Breckow that he was the owner of the Bar. (Doc. 70-2 at 8.) When Detective Breckow told Johari that a girl had called the police to report an incident, Johari stated "there was no incident, however a girl had come to the bar last night to apply for a job." (Doc. 70-2 at 8.) Johari explained that he could not remember the girl's name, but that she "and another promo girl named Tejia had been drinking in the bar." (Doc. 70-2 at 8.) Johari said he did not know how much the girl drank because "he was not with

---

[4] Although the parties do not define "SANE exam," the Court notes that the Arizona Child and Family Advocacy Network—of which the Scottsdale Family Advocacy Center is a part—refers to Sexual Assault Nurse Examiners as SANEs.

her very much, as the girl was drinking with Tejia." (Doc. 70-2 at 9.) Johari insisted that the girl was 21, "which he knew because he had photocopied her ID." (Doc. 70-2 at 9.) According to Johari, "the girl got drunk and passed out on the couch in the office." (Doc. 70-2 at 8.) Johari then "woke the girl up at approximately 0230 hours after she had been sleeping for approximately 40 minutes" and "told her she had to leave." (Doc. 70-2 at 8.) After she slept for 15 more minutes, she woke up, "freak[ed] out," and left the bar. (Doc. 70-2 at 8.)

Johari asked Detective Breckow what the girl had reported, and Detective Breckow told him "she reported some touching occurred in the bar's office after she fell asleep." (Doc. 70-2 at 9.) Johari insisted he had not touched her except on her shoulder to wake her up, and "stated specifically that he never touched her underneath her dress." (Doc. 70-2 at 9.) Johari also stated, inconsistently, that he could not have touched her because he "was never in [his] office." (Doc. 88 at 16.) Johari informed Detective Breckow that there was a camera inside the office. (Doc. 70-2 at 9.) According to Johari, he told "the new girl," who had changed in the office during her interview, that she was being filmed "everywhere" in the Bar. (Doc. 70-2 at 10.) Finally, Johari admitted that he had initially lied to the police about his arrival in the morning. (Doc. 70-2 at 10.) The police report noted: "He initially stated he did not go into the office. He then reluctantly stated he went into the office upon his arrival. After a little bit longer, [Johari] admitted he was inside the bar all night, as he never went home." (Doc. 70-2 at 11.)

On October 16, 2012, at 10:46 A.M., Detective Breckow served a search warrant. (Doc. 70-2 at 11.) Detectives began to copy the Bar's surveillance video from the computer on which it was stored. (Doc. 70-2 at 11.) The police found LG's purse outside the Bar's office, which contained LG's Arizona ID card, as well as the Arizona ID cards of three individuals over the age of 21. (Doc. 70-2 at 11.) Inside the office, police found a copy of one of the over-21 IDs on the photocopier. (Doc. 70-2 at 12.) In the office trash can, police found two forms with LG's Arizona ID card photocopied onto the bottom; one was ripped into pieces and the other was crumpled. (Doc. 70-2 at 12.)

At approximately noon, detectives noticed that the surveillance computer was apparently being remotely accessed. (Doc. 70-2 at 12.) Although police did not touch the computer, the mouse cursor was moving and closed the program that was copying the surveillance video. (Doc. 70-2 at 12.) Detective Todd Bailey observed "the portions of the surveillance video he had been attempting to copy had been deleted," so he immediately shut down the computer and seized it as evidence. (Doc. 70-2 at 12.) Detectives were able to recover some, but not all, portions of the deleted surveillance video. (Doc. 70-2 at 18.) After further analysis, Detective Bailey determined that some video clips were deleted before the remote access occurred, as the files were accessed from the computer between 5:29 A.M. and 6:13 A.M. on October 16, 2012. (Doc. 70-2 at 18.) According to the police report, "[a]t that time, there had been no remote computer access, so the files could only have been accessed by someone sitting at the computer. [Johari] was the only person in the bar at that time, as the bar had already been secured by police." (Doc. 70-2 at 18.)

Detective Breckow reviewed the surveillance video, which the parties provided to the Court. (Doc. 96.) The video evidence, reviewed by the Court, shows that on October 15, at around 10:18 P.M., LG and Johari walked into the office and began talking. Approximately half an hour later, Johari left the office and LG changed into a bikini. LG did not look at the camera as she changed. A few minutes later, Johari and another woman entered the office. Johari made some photocopies and left again with the other woman. LG, alone in the office, changed for a second time without looking at the camera. This time, her breast and nipple are visible on the video. At around 11:10 P.M., LG left the office and went into the bar area. For the next couple of hours, LG and Johari socialized and appeared to drink alcohol continuously. At times, they danced together on the dance floor. At 1:26 A.M., LG and Johari entered the office again. Both LG and Johari sat down on the couch and Johari put his arm around LG. Johari appeared to pull LG close such that she was lying across his lap, but LG sat up almost immediately. Johari grabbed LG's hand and moved it toward his leg and she moved her hand away. Next, Johari attempted to uncross LG's legs by putting his hand on the inside of her right leg, picking it up, and

putting it in between his own legs. LG immediately pulled away and re-crossed her legs. The two continued to talk and at 1:31 A.M., the video cut off. According to the police report, the subsequent clip was not recovered. (Doc. 70-2 at 20.)

The video resumes at 2:01 A.M. but the camera angle is different, as if the camera had been tilted. The video shows LG lying on the couch, apparently asleep. For the next hour or so, the video cuts off frequently as certain clips were not recovered. (Doc. 70-2 at 21.) What was recovered shows LG apparently falling in and out of sleep on the couch. On more than one occasion, Johari touched LG while she attempted to push him away. For example, at 2:03 A.M., Johari rubbed LG's side and then put his hand under her dress to rub her hip while she weakly tried to move his hand in what was apparently a semi-conscious state. About ten minutes later, Johari rubbed LG's back, side, and thigh, and lifted up her dress to expose her hip as LG quickly pulled her dress back down. Just as Johari reached between LG's legs, the video cuts off for the next five minutes. At approximately 3:22 AM, LG stood up and walked toward the door. Videos from other cameras show her walking down the stairs and exiting the Bar. Video evidence shows that after LG left, Johari returned to the office and attempted to clean it, including by rearranging the pillows on the couch and wiping down the cushions with a towel.

On June 6, 2014, DNA results from LG's buccal and vaginal swabs were produced. (Doc. 83-4 at 19.) The results indicated that two sperm samples from LG's body did not match Johari's DNA. (Doc. 83 at 63.) On July 2, 2014, police arrested Johari. (Doc. 88-4 at 75.) The case was submitted to the Maricopa County Attorney. (Doc. 70-2 at 35.) On July 11, 2014, a Maricopa County Grand Jury issued the following indictments against Johari: two counts of sexual abuse, two counts of voyeurism, one count of tampering with physical evidence, and one count of providing alcohol to a minor. (Doc. 70-6 at 1–3.) Johari's counsel "sent a deviation request to prosecutor Brad Miller explaining why the claims against Johari should be dismissed." (Docs. 83 at 66; 83-5.) On May 19, 2016, Johari pled guilty to one count of providing alcohol to a minor and the other counts were dismissed. (Doc. 70-8.)

## II.     The Sims Matter

On October 11, 2015, at 1:53 A.M., Tempe police officers Kurt Buczkowski, S. Neff and M. Momcilov were dispatched to Johari's bar—renamed as BAC Lounge—after a call to police reporting that two males were fighting on the back patio.  (Doc. 70-9 at 5.)  Each officer authored a separate report in connection with the incident. (70-9 at 5–12.)

According to Officer Buczkowski, when he arrived at the bar, Johari pointed at guest DJ Devin Sims[5] and yelled "he punched me."  (Doc. 70-9 at 5.)  The officers separated the two men.  (Doc. 70-9 at 5.)  Officer Buczkowski interviewed Frank Ramirez, a bouncer at the bar, who stated "[Johari's] claims of assault were false and [Sims] never punched him."  (Doc. 70-9 at 6.)  Ramirez told Officer Buczkowski that Johari was dissatisfied with Sims' performance and ten minutes before the end of the performance, Johari got on stage and attempted to kick out Sims.  (Doc. 70-9 at 6.)  Ramirez also stated that Johari was intoxicated while at work.  (Doc. 70-9 at 6.)  Next, Officer Buczkowski talked to Odis Robinson, the resident DJ at the Bar.  (Doc. 70-9 at 6.)  As Officer Buczkowski led Robinson away, Johari yelled to Robinson: "tell him that guy punched me in the face three times."  (Doc. 70-9 at 6.)  Robinson stated Johari was working that night and Robinson "was with [Johari] in the DJ booth area when [Johari] confronted [Sims] regarding his poor DJ performance."  (Doc. 70-9 at 6.)  According to Robinson, Johari "said something" to Sims; Sims then replied "don't talk to me like that" and punched Johari in the face three times.  (Doc. 70-9 at 6.)  Officer Buczkowski also interviewed Kevin Lewandowski, who was a managing partner with Johari.  (Doc. 70-9 at 7.)  Lewandowski told Officer Buczkowski that Johari was "operating the bar while intoxicated."  (Doc. 70-9 at 7.)  Lewandowski further stated "that the fight that [Johari] started spilled into a VIP booth."  (Doc. 70-9 at 7.)

Officer Momcilov interviewed Johari, who told him the following: Sims, who was hired as a DJ for the evening, was doing a "horrible job" and Johari asked him to leave.  (Doc. 70-9 at 8.)  Sims then "punched [Johari] with his closed fist three times on the left

---

[5] The parties refer to this individual as "Sims" but the police reports refer to him as "Sim." For consistency, the Court uses "Sims."

side of the face and they both fell on the ground of the DJ booth." (Doc. 70-9 at 8.) Officer Momcilov wrote there were "[n]o marks or bruises . . . observed on [Johari's] face during this interview that would be consistent with his assault allegations." (Doc. 70-9 at 8.) Further, Johari had "slurred speech, bloodshot watery eyes, and difficulty articulating what had allegedly taken place prior to [police] arriving to the scene." (70-9 at 8.) Officer Momcilov wrote that he was "able to smell the odor of intoxicating beverage emanating from [Johari's] breath while he was speaking." (Doc. 70-9 at 8.) However, Johari denied drinking alcohol "as he was working." (Doc. 70-9 at 8.) Police performed a PBT and found Johari's BAC level was 0.089. (Doc. 70-9 at 8–9.) Officer Momcilov also found a flask in Johari's pocket, which tested positive for alcohol. (Doc. 70-9 at 9.) When Officer Momcilov asked Johari "if there was any video that may have captured the incident," Johari replied there was a surveillance camera but "he was not sure if it would have captured the incident as the camera may not [have been] pointing in the direction of the DJ booth." (Doc. 70-9 at 8.)

Officer Neff wrote that when he arrived on the scene, he removed Sims from the back patio and escorted him down the stairs. (Doc. 70-9 at 10.) Officer Neff was approached by Ramirez, who informed him that Sims had done nothing wrong while Johari was drunk and "out of control." (Doc. 70-9 at 10.) When Officer Neff asked Sims whether he had punched Johari, Sims denied the allegations and Officer Neff observed that "[Sims'] hands displayed no signs of physical injury indicating that he had punched anyone or anything." (Doc. 70-9 at 11.) Officer Neff also observed that Johari was "heavily intoxicated" with bloodshot eyes, slurred speech, and the odor of alcohol on his breath. (Doc. 83-4 at 12.)

At 2:14 A.M., Officer Buczkowski arrested Johari for false reporting to a law enforcement officer, being intoxicated while operating a bar, and disorderly conduct. (Doc. 70-9 at 9.) Officer Buczkowski did not review the surveillance video before making the arrest. (Doc. 88-4 at 86.) On January 7, 2016, after receiving a copy of the surveillance video, which shows Sims apparently punching Johari, Assistant City Attorney Richard

Speer filed a motion to dismiss the charges against Johari. (Doc. 70-10 at 2.) The motion stated: "New information provided to the State tends to contradict statements given to the police at the time of their investigation. Although probable cause existed for the arrest, the State believes it is in the interest of justice to dismiss the matter." (Doc. 70-10 at 2.)

### III. Other Incidents

In addition to the two arrests described above, Johari has had other prior interactions with the Tempe Police Department. Before 2012, Johari received multiple citations for violating noise ordinances while operating the Bar. (Doc. 88-1 at 298–99.) Johari complained that the noise ordinances were disproportionately enforced and that other bars were allowed to operate with higher noise levels. (Doc. 88-1 at 299.) In August 2012, Tempe police responded to an altercation at the Bar involving a customer. (Doc. 88-1 at 300.) The police then referred a liquor law violation against Johari to the Arizona Department of Liquor Licenses. (Doc. 87 at 3.) An administrative court imposed sanctions on Johari but the sanctions were overturned on appeal. (Doc. 88-1 at 300.)

### IV. The Present Suit

In January 2017, Plaintiffs brought claims against Defendants City of Tempe (the "City"), Detective Bradley Breckow, Officer Kurt Buczkowski, and other officers of the Tempe Police Department, alleging claims under 42 U.S.C. § 1983 and Arizona law. (Doc. 6.) The parties cross-moved for summary judgment. (Docs. 77, 87.)

### STANDARD OF REVIEW

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is only genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In reviewing a motion for summary judgment, all evidence must be construed in the light most favorable to the non-moving party. *Id.* When resolving a motion for summary judgment, a court is not required

to "scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). Thus, when opposing a motion for summary judgment, a party must "identify with reasonable particularity the evidence that precludes summary judgment." *Id.*

Here, both parties moved for summary judgment. "[W]hen simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." *Tulalip Tribes of Wash. v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (citation omitted).

**ANALYSIS**

Plaintiffs assert claims for malicious prosecution, selective prosecution, abuse of process, violation of the right to pursue an occupation, and conspiracy, pursuant to 42 U.S.C. § 1983, which allows suits against state actors for actions taken under state law that violate the Constitution. (Doc. 6 at 7–10.) In addition, Plaintiffs allege a *Monell* claim under § 1983. (Doc. 6 at 8.) Plaintiffs also assert state law claims for malicious prosecution, abuse of process, negligence and gross negligence, and tortious interference with business relations. (Doc. 6 at 10–12.)

Officers sued under § 1983 are entitled to qualified immunity if "they act reasonably under the circumstances, even if the actions result in a constitutional violation." *Ramirez v. Butte-Silver Bow County*, 298 F.3d 1022, 1027 (9th Cir. 2002). In determining whether an officer is entitled to qualified immunity, courts ask (1) whether the officer's conduct violated a constitutional right; and (2) whether the right was clearly established at the time of the conduct. *Lacey v. Maricopa County*, 693 F.3d 896, 915 (9th Cir. 2012). Courts have discretion in deciding which of the two questions to address first. *Id.* If the answer to either question is negative, "then the officer's conduct was constitutional, and there can be no violation of § 1983." *Id.*

I. **Malicious Prosecution**

Plaintiffs allege that Johari was subjected to malicious prosecution with regard to

both the LG matter and the Sims matter, in violation of § 1983 and Arizona state law. "In order to prevail on a § 1983 claim of malicious prosecution, a plaintiff 'must show that the defendants prosecuted [him] with malice and without probable cause, and that they did so for the purpose of denying [him] equal protection or another specific constitutional right.'" *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004) (citation omitted). "Federal courts rely on state common law for elements of malicious prosecution." *Mills v. City of Covina*, 921 F.3d 1161, 1169 (9th Cir. 2019). In Arizona, the elements of malicious prosecution are (1) a criminal prosecution, (2) that terminates in favor of plaintiff, (3) with defendants as prosecutors, (3) actuated by malice, (5) without probable cause, and (6) causing damages. *Slade v. City of Phoenix*, 112 Ariz. 298, 300, 541 P.3d 550, 552 (Ariz. 1975). "Malicious prosecution actions are not limited to suits against prosecutors but may be brought . . . against other persons who have wrongfully caused the charges to be filed." *Awady*, 368 F.3d at 1066. Here, Plaintiffs allege that Detective Breckow wrongfully caused charges to be filed against Johari in the LG matter and Officer Buczkowski wrongfully caused charges to be filed against Johari in the Sims matter.

"The failure to establish lack of probable cause is a complete defense" in a malicious prosecution claim. *Bird v. Rothman*, 128 Ariz. 599, 602, 627 P.2d 1097, 1100 (Ariz. Ct. App. 1981). "Whether the facts in a case are sufficient to constitute probable cause is a question of law for the court to be determined by a reasonable person test[.]" *Id.* Probable cause "is not a high bar." *District of Columbia v. Wesby*, 138 S.Ct. 577, 586 (2018). "When the police make an arrest based upon probable cause, it is not material that the person arrested may turn out to be innocent, and the arresting officer is not required to conduct a trial before determining whether or not to make the arrest." *Cullison v. City of Peoria*, 120 Ariz. 165, 168 (Ariz. 1978). Rather, the existence of probable cause depends on whether "the arresting officers have reasonably trustworthy information of facts and circumstances which are sufficient in themselves to lead a reasonable man to believe an offense . . . has been committed and that the person to be arrested . . . did commit it." *State v. Richards*, 110 Ariz. 290, 291 (Ariz. 1974). In evaluating probable cause, the Court

applies a "totality of the circumstances" test rather than an "excessively technical dissection." *Wesby*, 138 S.Ct. at 586.

### A. The LG Matter

Detective Breckow had probable cause in having Johari arrested in the LG matter. Thus, Detective Breckow did not violate Johari's constitutional rights and is entitled to qualified immunity.

"Generally, probable cause for an arrest 'may be satisfied by an indictment returned by a grand jury.'" *Lacy v. County of Maricopa*, 631 F. Supp. 2d 1183, 1194 (D. Ariz. 2008) (citation omitted). The grand jury's indictment is "prima facie evidence of probable cause," and the "presumption of probable cause can be rebutted if officers improperly exerted pressure on the prosecutor, knowingly provided misinformation, concealed exculpatory evidence, 'or otherwise engaged in wrongful or bad faith conduct that was actively instrumental in causing the initiation of legal proceedings.'" *Bryant v. City of Goodyear*, No. CV-12-00319, 2014 WL 2048013, at *3 (D. Ariz. May 19, 2014) (citation omitted). Here, Johari was indicted by a grand jury on two counts of sexual abuse, two counts of voyeurism, one count of tampering with physical evidence, and one count of providing alcohol to a minor. Thus, there is a presumption of probable cause that Plaintiffs must rebut.

Plaintiffs present no evidence indicating that Detective Breckow exerted pressure on the prosecutor, knowingly provided misinformation, concealed exculpatory evidence, or engaged in bad faith conduct. Plaintiffs make much of the fact that Detective Breckow apparently did not inform the prosecutor that "DNA sperm evidence [found on LG] matched other male(s), not Johari." (Doc. 87 at 20.) However, LG never accused Johari of ejaculating upon her, and DNA sperm evidence matching other males is not "exculpatory evidence." Further, Plaintiffs assert that Detective Breckow failed to inform the prosecutor that certain portions of LG's account—such as her description of leaving the bar and encountering locked doors—did not match the surveillance video evidence. (Doc. 87 at 13, 20.) Detective Breckow did not conceal any such evidence because the

Maricopa County Attorney was provided with the entirety of the Tempe Police Department's file, which included recorded interviews, physical evidence, photographic evidence, and surveillance video evidence. (Docs. 83-6 at 368; 70-2.)

Even without a presumption of probable cause, when considering the totality of the circumstances, Detective Breckow had probable cause to believe that Johari committed the crimes for which he was arrested. LG accused Johari of touching her, including her vagina and anus, without consent. LG also recounted to police what she could remember of the evening, including her arrival, the interview, changing her clothes during the interview, being provided alcohol, falling asleep on the couch in the office, and Johari's position relative to hers on the couch. Most of these details were confirmed by video evidence, which shows LG changing in the office and Johari's subsequent interactions with her while she slept on the couch. On the other hand, Johari admitted to Detective Breckow that he lied about his arrival at the bar—Johari initially said he arrived in the morning but later admitted he had stayed at the bar all night—and officers are entitled to infer that "lies suggest[] a guilty mind." *Wesby*, 138 S.Ct. at 587. Johari's version of the events was also contradicted by the video evidence that police reviewed, which revealed that Johari made the following inaccurate statements to police: he was not with LG very much that night, he was "never in [his] office," he touched LG only on her shoulder to wake her up, and he "wasn't even talking" to LG. (Doc. 88 at 15–16.)

Plaintiffs argue "the objective video evidence does not show any sexual abuse"; therefore, there was no probable cause to believe that sexual abuse occurred. (Doc. 87 at 18.) This argument is preposterous. Under Arizona law, sexual abuse is defined as "intentionally or knowingly engaging in sexual contact with any person fifteen or more years of age without consent of that person." A.R.S. § 13-1404(A). The video evidence shows Johari repeatedly touching and attempting to touch LG, even after she tried to push him away multiple times, while she was apparently unconscious and/or semi-conscious. Plaintiffs also completely ignore the fact that the video cuts off for a few minutes just after Johari placed his hand between LG's legs, and police saw clips of the surveillance video

being deleted through remote access to the office computer. Police also determined that between 5:29 A.M. and 6:13 A.M., someone sitting at the computer had deleted video clips as well, and Johari was the only person that had physical access to the computer at that time. (Doc. 88 at 27–28.) Plaintiffs assert that LG's accusations were not credible because portions of her account to police, particularly with regard to how she left the bar, did not match the video evidence. However, some inconsistencies and/or lack of verification of a victim's statement do not necessarily preclude the finding of probable cause. *See Jimenez v. Yuma County*, No. 1 CA-CV 14-0724, 2016 WL 126285, at *3 (Ariz. Ct. App. Jan 12, 2016). That LG did not recount how she left the bar with complete accuracy—for example, whether she walked or ran, and whether she encountered locked doors—does not mean she "lost all credibility" with regard to her accusations. (Doc. 87 at 18.) Viewed in light of all the facts and circumstances, police had "reasonably trustworthy information" to believe Johari had committed the offenses for which he was arrested.

Because Detective Breckow had probable cause to believe Johari committed the crimes for which he was arrested, summary judgment is granted to Defendants with regard to Plaintiffs' malicious prosecution claim under both § 1983 and Arizona law.

**B. The Sims Matter**

With regard to the Sims matter, Officer Buczkowski is entitled to qualified immunity because there is no evidence that he violated a clearly established constitutional right. The Supreme Court has instructed courts "not to define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). Rather, courts ask whether the "violative nature of *particular conduct* is clearly established." *Id.* (emphasis added); *see, e.g.*, *Thompson v. Rahr*, 885 F.3d 582, 584 (9th Cir. 2018) (holding that particular police conduct of pointing a loaded gun at an unarmed suspect's head after he had already been searched did not violate clearly established law on excessive force). "The plaintiff bears the burden to show that the contours of the right were clearly established." *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1109 (9th Cir. 2011). While the Supreme Court does not "require a case directly on point" for a right to be clearly

established, "existing precedent must have placed the . . . constitutional question beyond debate." *White v. Pauly*, 137 S.Ct. 548, 551 (2017) (citation omitted).

Here, Plaintiffs have not even identified exactly what the particular violation is. Rather, they argue generally that Officer Buczkowski lacked probable cause when he arrested Johari. Johari was arrested for false reporting to a law enforcement officer, being intoxicated while operating a bar, and disorderly conduct. Police arrested Johari after observing that Johari was intoxicated and did not have marks to indicate that he was punched, and after overhearing Johari instruct a witness to tell police that Johari was punched by Sims. In addition, a witness told police that Johari was lying about being punched by Sims, and multiple witnesses stated that Johari was intoxicated while working at the Bar. Despite these facts, Plaintiffs insist that Johari was arrested without probable cause. But Plaintiffs do not point to which particular police conduct was violative of clearly established law.

While Plaintiffs take issue with the fact that Officer Buczkowski did not review the surveillance video evidence or speak with certain other witnesses before arresting Johari, they cite no law suggesting that officers must take these actions before making an arrest. By contrast, courts have been clear that there is no categorical rule requiring review of surveillance videos or performance of an extensive investigation to find probable cause. *See, e.g.*, *Dobrowolski v. City of Mesa*, No. CV 09-1387-PHX-SRB, 2010 WL 11515564, at *6 (D. Ariz. Oct. 27, 2010) ("The information did not indicate that a probable cause decision required review of the surveillance footage."). As such, Officer Buczkowski did not violate clearly established law and is entitled to qualified immunity. Summary judgment is granted to Defendants with regard to Plaintiffs' malicious prosecution claim under both § 1983 and Arizona law. *See, e.g.*, *Spooner v. City of Phoenix*, 246 Ariz. 199, 435 P.3d 462, 467 (Ariz. Ct. App. 2018).

## II. Selective Prosecution

In their operative complaint, Plaintiffs allege that Johari was "subjected to . . . selective investigations and prosecutions without probable cause." (Doc. 6 at 8.) A § 1983

selective prosecution claim requires the plaintiff to "identify a 'similarly situated' class against which plaintiff's class can be compared." *Dowling v. Arpaio*, 858 F. Supp. 2d 1063, 1081 (D. Ariz. 2012) (citation omitted). If the alleged selective enforcement "does not implicate a fundamental right or a suspect classification, the plaintiff can establish a 'class of one' equal protection claim by demonstrating that [he] 'has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *Id.*

In their motion for summary judgment, Defendants argue that Plaintiffs cannot show Johari was treated differently without a rational basis. (Doc. 77 at 18.) Plaintiffs do not address Defendants' argument in their response and cross-motion for summary judgment; nor do they point to any admissible evidence showing that Johari was treated differently from similarly situated individuals without a rational basis. Rather, Plaintiffs conclusively state that "Defendants . . . violated Plaintiffs' Fourth Amendment rights by wrongfully causing him to be prosecuted without probable cause. All the above-mentioned constitutional violations underly the § 1983 claims for malicious prosecution, selective prosecution, abuse of process, failure to train, and conspiracy to commit 1983 violations." (Doc. 87 at 14.) Because Plaintiffs have not demonstrated that Johari was treated differently without a rational basis, summary judgment is granted to Defendants with regard to the selective prosecution claim.

### III.   Abuse of Process

Next, Plaintiffs allege that Defendants are liable for abuse of process under § 1983 and Arizona law. In Arizona, "to establish a claim for abuse of process there must be a showing that the defendant has (1) used a legal process against the plaintiff; (2) primarily to accomplish a purpose for which the process was not designed; and, (3) harm has been caused to the plaintiff by such misuse of process." *Nienstedt v. Wetzel*, 133 Ariz. 348, 353, 651 P.2d 876, 881 (Ariz. Ct. App. 1982). In order to show that the defendant's primary motive was improper, a plaintiff "must not only present evidence that the defendant used a court process for a primarily improper purpose, they must also show that, in using the court

process, the defendant took an action that could not logically be explained without reference to the defendant's improper motives." *Crackel v. Allstate Ins. Co.*, 208 Ariz. 252, 259, 92 P.3d 882, 889 (Ariz. Ct. App. 2004). With regard to the federal claim, the Ninth Circuit has not yet determined if an abuse of process claim is cognizable under § 1983. *See West v. City of Mesa*, 708 F. App'x 288, 292 (9th Cir. 2017).

Even assuming that Plaintiffs have a valid claim under § 1983, they have failed to show that Defendants used any legal process for a purpose for which it was not designed. In support of their abuse of process claims, Plaintiffs state—without identifying Defendants' allegedly improper purpose—that Plaintiffs "incorporate all previous arguments and facts showing Defendants wrongfully [sic] Plaintiffs' prosecution in deprivation of their constitutional rights." (Doc. 87 at 20.) Because Plaintiffs' abuse of process claims are "essentially duplicative of their malicious prosecution" claims, summary judgment is granted to Defendants with regard to the abuse of process claims. *Donahoe v. Arpaio*, 869 F. Supp. 2d 1020, 1060 (D. Ariz. 2012).

## IV. *Monell* Claim

Plaintiffs assert a *Monell* claim against the City, arguing that "[a]t the time of the [LG] incident, the City of Tempe employed a non-revictimization approach and formerly had no policy encouraging officers to interview alleged sex-crime victims after they had one to two sleep cycles." (Doc. 87 at 21.) "Liability may attach to a municipality only where the municipality itself causes the constitutional violation through 'execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" *Ulrich v. City and County of San Francisco*, 308 F.3d 968, 984 (9th Cir. 2002) (citing *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 694 (1978)). There can be no *Monell* liability on the part of a municipality based on an officer's conduct if that officer is found to have committed no constitutional violation. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). Here, the City cannot be liable because Detective Breckow committed no constitutional violation in the LG

matter. Thus, summary judgment is granted to Defendants with regard to Plaintiffs' *Monell* claim.

## V. Right to Pursue an Occupation

In their cross-motion for summary judgment, Plaintiffs assert "Defendants deprived Johari of his right to pursue an occupation when it systematically targeted him and attempted to misuse its authority and the legal system to shut him out of business through the [LG] incident." (Doc. 87 at 14.) In response, Defendants argue this claim was improperly raised for the first time at summary judgment. (Doc. 92 at 7.) Plaintiffs reply that they did not raise this claim for the first time at summary judgment; rather, they raised it "in a March 2018, Rule 408 protected communication to Defendants' counsel." (Doc. 94 at 8.)

Defendants are mistaken. The Ninth Circuit requires that "allegations in the complaint 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968 (9th Cir. 2006) (citation omitted). A claim for the denial of a right to pursue an occupation requires allegations that the plaintiff is "unable to pursue an occupation" in the relevant business, and that "this inability is due to actions that substantively were 'clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals or general welfare.'" *Wedges/Ledges of California, Inc. v. City of Phoenix*, 24 F.3d 56, 65 (9th Cir. 2009). Plaintiffs' operative complaint, which did not raise this claim or plead facts to support it, failed to give Defendants fair notice about the claim and the grounds upon which it rests. As such, summary judgment is granted to Defendants with regard to Plaintiffs' claim based on the right to pursue an occupation.

## VI. Negligence and Gross Negligence

Plaintiffs allege the arrests of Johari were negligent and/or grossly negligent under Arizona law, arguing: "First, Defendants' arrests of Johari were unlawful. Second, even if they were not unlawful, then Defendants are still liable to Plaintiffs for negligence and gross negligence." (Doc. 87 at 22.) Plaintiffs offer no other explanation, cite no law, and

point to no evidence to support their claims of negligence and gross negligence. As such, summary judgment is granted to Defendants with regard to these claims.

## VII. Tortious Interference with Business Relations

Plaintiffs allege that Defendants "intentionally and improperly interfered with Plaintiffs' prospective contractual relations by investigating and pursuing unsubstantiated felony charges against Johari that have harmed the reputation and business of the Bar." (Doc. 6 at 12.) On summary judgment, Defendants argue this claim is barred by the statute of limitations. (Doc. 77 at 22–23.) Plaintiffs do not respond.

Defendants are correct. Under Arizona law, "[a]ll actions against any public entity or public employee shall be brought within one year after the cause of action accrues and not afterward." A.R.S. § 12-821. "[A] cause of action for tortious interference accrues when the plaintiff knew or reasonably should have known of the intentional interference with the plaintiff's business expectancy." *Dube v. Likins*, 216 Ariz. 406, 411–12, 167 P.3d 93, 98–99 (Ariz. Ct. App. 2007). Only the LG matter involved felony charges, which Plaintiffs allege form the basis of their claim for tortious interference with business relations. Johari was arrested on July 2, 2004, the date on which the action for tortious interference began to accrue. Plaintiffs filed their complaint on January 11, 2017, well after the one-year deadline. Accordingly, summary judgment is granted to Defendants with regard to the claim for tortious interference with business relations.

## VIII. Conspiracy to Commit § 1983 Violations

Plaintiffs have not clearly explained their conspiracy claim, arguing only that a jury "could find a conspiracy existed between, among other things, the City of Tempe's actions against Johari with respect to the [enforcement of noise ordinances], Officer Ferraro's comments to the liquor board when referring a case against Johari that would ultimately be dismissed, the [LG] incident, and the DJ Devin Sims incident." (Doc. 87 at 21.)

First, a § 1983 conspiracy claim requires an "underlying constitutional violation." *Lacey*, 693 F.3d at 935. There was no constitutional violation with respect to the City's enforcement of noise ordinances, Officer Ferraro's comments to the liquor board, and the

LG matter. Thus, there can be no § 1983 conspiracy claim with regard to these incidents.

Second, the Court need not reach the issue of whether there was an underlying constitutional violation in the Sims matter, because the conspiracy claim fails for another reason. Plaintiffs appear to allege that the City conspired with its own police officers to arrest Johari. This theory is wrong under the "intracorporate conspiracy doctrine, which bars a claim for conspiracy where the allegation is that an entity conspired with its employees to violate an individual's constitutional rights." *Donahoe*, 869 F. Supp. 2d at 1074.

As such, summary judgment is granted to Defendants with regard to the § 1983 conspiracy claim.

Accordingly,

**IT IS ORDERED** Defendants' Motion for Summary Judgment (Doc. 77) is **GRANTED**.

**IT IS FURTHER ORDERED** Plaintiffs' Cross-Motion for Summary Judgment (Doc. 87) is **DENIED**.

**IT IS FURTHER ORDERED** the Clerk of Court shall enter judgment against Plaintiffs.

Dated this 16th day of September, 2019.

Honorable Roslyn O. Silver
Senior United States District Judge